```
                                              ┌─────────────────────────────┐
                                              │ USDC SDNY                   │
                                              │ DOCUMENT                    │
                                              │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT                  │ DOC #:                      │
SOUTHERN DISTRICT OF NEW YORK                 │ DATE FILED: 7/26/13         │
                                              └─────────────────────────────┘
----------------------------------------------- x
                                                :
BANCO DE LA REPUBLICA DE COLOMBIA,              :
                                                :
                                                :   OPINION AND ORDER
                          Plaintiff,            :   GRANTING IN PART AND
                                                :   DENYING IN PART
            -against-                           :   PLAINTIFF'S AND
                                                :   DEFENDANTS' MOTIONS
                                                :   FOR SUMMARY JUDGMENT
THE BANK OF NEW YORK MELLON,                    :
BNY MELLON, N.A., and                           :   10 Civ. 536 (AKH)
BNY MELLON ASSET SERVICING, B.V.,               :
                                                :
                          Defendants.           :
                                                :
----------------------------------------------- x
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiff Banco de la República de Colombia ("Banco de Colombia"), the central bank of Colombia, engaged Defendant BNY Mellon Asset Servicing ("BNYMAS") to invest a portion of the nation's reserve funds held by the bank. The contract barred investments in issuers located in the Cayman Islands. Banco de Colombia filed this lawsuit to recover $20 million from BNYMAS for investing the reserve funds in an asset-poor special purpose entity incorporated in Delaware whose obligations were guaranteed by a company incorporated in the Cayman Islands. Banco de Colombia alleges that BNYMAS breached its contract with Banco de Colombia by making this investment and is responsible for the $20 million loss it suffered. Banco de Colombia alleges also that BNYMAS committed fraud when it repeatedly told Banco de Colombia that it was complying with the terms of the contract, and failed to disclose information that the entity and its guarantor were in bad financial condition and about to fail.

For the reasons stated in this opinion, I grant Banco de Colombia's motion for summary judgment as to BNYMAS's liability on the breach of contract and failure to disclose

claims, but I deny Banco de Colombia's motion to the extent it seeks damages because of triable

questions of fact. I also grant Defendants' motion for summary judgment dismissing the

fraudulent misrepresentation and negligent misrepresentation claims.

## I.    BACKGROUND

As Colombia's central bank, Banco de Colombia administers the nation's

international reserves, investing them within Colombia and abroad. For its foreign investments,

Banco de Colombia contracts with external managers.

On June 22, 2005, Banco de Colombia and BNYMAS entered into an agreement

engaging BNYMAS to act as an external investment manager for Banco de Colombia.[1]  Under a

Securities Loan Agreement (the "Agreement"), Banco de Colombia lent securities in the national

reserves to other investors, against cash collateral securing the borrowers' obligations to return

the securities. BNYMAS invested the cash collateral for Banco de Colombia to gain interest

income for it, less a fee to BNYMAS, graduated in relation to the amount earned. See Def. Ex.

12 at 1029.[2]

Banco de Colombia's contract with BNYMAS gave BNYMAS investment

discretion, subject to Investment Guidelines (the "Guidelines") that limited investments of the

cash collateral to particular categories of instruments. The eligible investments were required to

have a minimum credit rating. Section 3.7 of the Guidelines provided that "Eligible issuers,

borrowers and repurchase agreement counterparties may not be located in . . . offshore financial

---

[1] Banco de Colombia alleges that the other Mellon defendants are jointly and severally liable because of their
affiliation with BNYMAS.

[2] All references to exhibits refer to the exhibits that the parties submitted in conjunction with their December 27,
2012 submissions, unless otherwise indicated.

centers. . . ." Def. Ex. 12 at 1046. Section 3.7 included the Cayman Islands in a list of prohibited offshore financial centers.

Banco de Colombia also required BNYMAS to issue monthly certifications that the Guidelines were being followed. To comply, BNYMAS certified that: "Eligible issuers, borrowers and repurchase agreement counterparties are not located in any of the financial offshore centers cited in the investment guidelines." Pl. Ex. 14.

On April 30, 2007, BNYMAS invested $20 million of cash collateral given to Banco de Colombia by a borrower of its securities, in notes (the "Notes") payable October 30, 2008. The private placement memorandum for the investment indicated that the Notes were issued by Sigma Finance, Inc. ("SFI") and guaranteed by Sigma Finance Corp. ("SFC"). SFI was incorporated in Delaware and functioned as a special purpose entity, having as its "sole purpose," according to the private placement memorandum in the files of BNYMAS, "the issuing and selling [of] debt securities as a nominee for [SFC]."[3]  SFI was wholly-owned by SFC, and had no assets other than $1,000 of paid-up capital given to it by SFC. Pl. Ex. 20 at 1, 5.

SFC was incorporated in the Cayman Islands. Its registered office was in George Town, the capital of the Cayman Islands. Its investment manager was a London company, Gordian Knot Limited. Id. at 6. BNYMAS made the investment pursuant to its investment discretion, without consulting Banco de Colombia and without providing BNYMAS with information on SFI and SFC. Nevertheless, some Banco de Colombia employees had limited knowledge of SFC, as at least two of the bank's employees knew it was located in an offshore

---

[3] There is no evidence that Banco de Colombia was given the private placement memorandum, or otherwise saw it, during the time period at issue. As Banco de Colombia's investment agent with all but complete discretion, BNYMAS did not have an obligation to deliver disclosure documents of investments to its clients, except if requested.

3

financial center. See Def. Ex. 16 (attachment to August 1, 2007 email including SFC in a list of offshore financial center issuers); Pl. Ex. 12 (Jan. 21, 2003 spreadsheet entry describing SFC as located in an offshore financial center).

SFI and SFC functioned together as a structured investment vehicle ("SIV"). Like banks, SIVs made money in the margins between their borrowing costs and lending revenues. See King Cnty., Washington v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288, 292-93 (S.D.N.Y. 2012). At the time, many SIVs, like SFC, were incorporated in the Cayman Islands and managed from London. One management technique to increase profits was to borrow at short term, and lend at longer terms. Within months after BNYMAS purchased the Notes, however, the markets in which SIVs functioned began to falter. By October 2007, several major United States banks began raising funds to support SIVs in repaying debts. See Carrick Mollenkamp, et al., How London Created a Snarl in Global Markets, Wall Street J., Oct. 18, 2007, at A1.

Banco de Colombia became concerned about the safety of the national reserves entrusted to it. On January 24, 2008, Banco de Colombia amended the Guidelines to forbid purchases of "securities issued or backed by Structured Investment Vehicles." Def. Ex. 12 at 1060. On March 19, 2008, Banco de Colombia instructed BNYMAS not to make new investments on Banco de Colombia's behalf, for it would no longer lend its securities, and to sell all investments with more than 60 days to maturity if that could be done without incurring financial loss. Pl. Ex. 47. Since the investment in SFC already showed a loss, it was not sold. Banco de Colombia instructed BNYMAS to provide market prices of affected securities weekly to enable Banco de Colombia to "determine the best course of action." Def. Ex. 12 at 1063.

4

On April 4, 2008, Moody's downgraded SFC's and SFI's credit rating. The next day, a Banco de Colombia official asked BNYMAS for a "full report from you regarding this issuer, as well as the expectations going forward." Pl. Ex. 51. A BNYMAS official responded three days later by explaining that the downgrade was "not based on the underlying quality of [SFC's] collateral." Id. He said that SFC had no direct exposure to investments in subprime mortgages which had been damaging the economy, was "favourably structured," and had reduced its lending, thereby "enhancing the position of the senior note holders." Id. The following month, BNYMAS assured Banco de Colombia that "Sigma continues to function and pay maturities as and when they become due. They have a solid underlying asset base valued at 95, and despite the reduction in prices seen, we have seen recent issues mature at par." Pl. Ex. 60.

At the same time, internally, BNYMAS officials expressed a more dire view of SFC's financial affairs. In a January 31, 2008 email, a BNYMAS official wanted a meeting to discuss a "siv called sigma which we believe may be moving closer to a default because of current market conditions and the difficulty it is currently experiencing in funding itself." Pl. Ex. 37. On February 1, 2008, a BNYMAS official emailed his colleague saying "I NEED TO KNOW EVERYTHING ABOUT SIGMA" and asked to get a sense of "who else buys sigma and may be stuck with this mess with us." Pl. Ex. 40. On February 17, 2008, that same official commented that "if we could just find somebody to nationalize sigma, our lives would be a heck of a lot better." Pl. Ex. 41. A March 2008 draft BNYMAS memo concluded that "the SIGMA structured investment vehicle is expected to be in default. . . ." Pl. Ex. 46. At the beginning of April, a BNYMAS official told a colleague that "Sigma called to tell us that essentially, things are getting worse for them, not better, with the passage of time. They can not access funding,

5

and maturities continue to drain liquidity." Pl. Ex. 48. At that time, BNYMAS's securities lending division had "significant concerns that Sigma will fail in Q3 or Q4." Pl. Ex. 52. BNYMAS employees also discussed SFC with other investors in the troubled company. One of those investors was "more pessimistic than we [BNYMAS] are regarding Sigma's life expectancy. They don't expect them to survive through 6/30/08." Pl. Ex. 53. Another investor told BNYMAS that it viewed SFC "as having little or no chance of survival (leaning towards no chance)." Pl. Ex. 58.

Given their conclusion that there was a high possibility that SFC would default, BNYMAS personnel strategized as how best to deal with their clients invested in SFC. In a January 31, 2008 email, a BNYMAS employee told his colleagues that with regards to SFC, "we're entering a very unusual period and we need to restrain our traditional response to heroically support our clients, until we better understand the implications of that support." Pl. Ex. 37. In a May 15, 2008 email, a BNYMAS official suggested, with the exception of two clients in the United Kingdom, that BNYMAS not disclose their concerns to clients who were invested in SFC. That official noted that most of their clients had only a "tiny" exposure to SFC. He indicated that: "We believe that the situation is gradually improving and if left to maturity in all likelihood no loss will be incurred." Pl. Ex. 59. He also worried that giving all of their clients a full briefing on SFC's poor financial state would be "more likely to create the problem we are trying to avoid (i.e. it becomes a self-fulfilling prophesy)." Id.

BNYMAS, however, did offer some of its clients a solution to reduce their exposure to SFC. BNYMAS proposed asset swaps to several clients by which SFC would buy back the notes it had issued in exchange for other assets held by SFC. In undertaking an asset swap, BNYMAS clients essentially agreed to accept an immediate loss in exchange for a better

6


under pressure." Pl. Ex. 65. BNYMAS responded that "Sigma has not defaulted on any of its interest payments, and there has been a great deal of issues successfully reaching maturity over the passed [sic] months," that the low price of the Notes was a "'hangover' from the downgrade of Sigma several months ago," and that "[a]cross the board the BNY Mellon stance remains the same with regards to this issue, we will continue to hold to maturity and currently see no reason to deviate from that position." Id.

A month later, on September 30, 2008, SFI defaulted on the Notes, and SFC defaulted on its guarantee. Both filed for the protection of liquidation proceedings in the United Kingdom. Banco de Colombia's $20 million investment became nearly worthless.

Banco de Colombia filed this action against Defendants on April 21, 2009 in New York State Supreme Court. Defendants removed the case to federal court on January 25, 2010. With discovery complete, both parties moved for summary judgment on December 27, 2012.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on undisputed facts, the moving party is entitled to judgment as a matter of law. D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). An issue of fact is genuine if the evidence is such that the jury could return a verdict for the nonmoving party. Allianz Insurance Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). An issue of fact is material if it might affect the outcome of the suit under the governing law. Id. The court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). However, "[m]ere speculation and conjecture is insufficient to preclude the

granting of the motion." Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

   In contract cases, where the language at issue is unambiguous, interpreting the contract is a question of law for the court. JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009). It is the court's role to determine whether contractual language is ambiguous. Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989). Instead, "[a]mbiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" JA Apparel Corp., 568 F.3d at 396-97 (citations omitted).

## III. DISCUSSION

### A. Breach of Contract Claim

   Banco de Colombia contends that BNYMAS breached the Agreement and, specifically, Section 3.7 of the Guidelines incorporated into the Agreement, by investing collateral in Notes and Guaranties in the Sigma Structured Investment Vehicle. Section 3.7 prohibited investments in "issuers" "located in" the Cayman Islands and that included, Banco de Colombia contends, investments where the real party in interest, the guarantor, is a company located in the Cayman Islands. BNYMAS, in defense, contends that the issuer was solely the company labeled an "issuer" in the Notes and was not located in the Cayman Islands.

9

## 1. Issuer

The parties' Agreement and Guidelines do not define "issuer." In cases where a provision in dispute is a term of art in an industry, that term should "be interpreted as usually understood by the persons in the profession or business to which they relate." Estate of Hatch v. NYCO Minerals, Inc., 245 A.D.2d 746, 747 (N.Y. App. Div. 1997). Here, where the term of art relates to a security, securities laws can reveal a commonly understood meaning of that term among those who buy and sell securities. Cf. Citadel Equity Fund Ltd. v. Aquila, Inc., 371 F. Supp. 2d 510, 517-18 (S.D.N.Y. 2005) (consulting legal treatises to determine the definition of a term in a credit agreement).

Both state and federal statutes define "issuer" to include guarantors. The New York Uniform Commercial Code—which the parties twice referenced in the Agreement— provides: "With respect to an obligation on or defense to a security, a guarantor is an issuer to the extent of its guaranty. . . ." N.Y. U.C.C. § 8-201(b).[4] The UCC provides also that a person is an issuer if that person "becomes responsible for, or in place of, another person described as an issuer in this section." Id. at § 8-201(a)(4). Under both of these provisions, SFC was an issuer of the Notes.

SFC would be considered an "issuer" under the federal securities laws as well. Under the Securities Act of 1933 (the "Securities Act"), a "guarantee" can be a "security," 15 U.S.C. § 77b(a)(1), particularly if "incorporated in securities distributed to investors." H.R. Rep.

---

[4] I asked the parties, at argument, which law governs, among the possible states and nations with contacts: New York, Delaware, the Cayman Islands, Colombia, the United Kingdom, and the Netherlands. The parties agreed that the law should be that of New York. This is a reasonable conclusion. The parties' Agreement contemplated that New York law would be applied, as it twice cited New York's Uniform Commercial Code and stipulated that disputes should be resolved by state or federal courts sitting in New York City. I therefore hold that New York law governs. See Int'l Bus. Mach. Corp. v. Liberty Mutual Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

10

No. 73-1838, at 39 (1934). The SEC has made clear that in cases where a wholly-owned subsidiary issues securities that are exclusively guaranteed by the parent, investors "look to the financial status of the parent company that guaranteed the debt to evaluate the likelihood of payment." Financial Statements and Periodic Reports for Related Issuers and Guarantors, Exchange Act Release No. 55 (Aug. 4, 2000).

The parties' Agreement references both the New York UCC and federal securities laws. Clearly, they agreed on the context of those laws. If the parties had intended that a different definition of "issuer" should govern, they would have made sure to include that definition in the Agreement.

The definition of "issuer" under the UCC and the securities laws reflects the economic reality of the investment in the Sigma entities, SFI and SFC. As one of BNYMAS's own employees characterized it, SFI was a "shell," an organization that had almost no assets of its own and depended entirely on SFC for support. Pl. Ex. 31. The purpose of Section 3.7 was to ensure that Banco de Colombia's assets were not invested in offshore companies. BNYMAS's narrow reading of that section would defeat its purpose, for it would invite evasion rather than compliance. Contracts should be interpreted consistently with the parties' reasonable expectations, not to so defeat them. See, e.g., Madison Ave. Leasehold, LLC v. Madison Bentley Associates LLC, 30 A.D. 3d 1 (N.Y. App. Div. 2006), aff'd, 8 N.Y.3d 59 (2006) ("[T]he expectations and purposes of the parties in view of the factual context in which the agreement was made must be considered in interpreting a contract term, with due regard to the parties' sophistication."). The Notes issues by SFI would have had no value if it were not backed up by SFC's guaranty.

11

BNYMAS argues that the parties incorporated the definition of "issuer," not of the Securities Act, but of the Securities Exchange Act of 1934 (the "Exchange Act"), and there is no mention of "guarantees" in the definition of "securities" in the Exchange Act. However, the Exchange Act also defines "securities" expansively. See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 238 (2d Cir. 1985) ("The definitions of 'security' [under the Securities Act and the Exchange Act] are broad and ambiguous; they allow courts to use a flexible approach 'to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits.'") (quoting SEC v. W.J. Howey Co., 328 U.S. 293, 299 (1946)). The Exchange Act states that "any instrument commonly known as a 'security'" is included in the definition of "securities," 15 U.S.C. § 78c(a)(10), and that would include a guaranty that is an essential component of an investment. See Gary Plastic Packaging Corp., 756 F.2d at 238 ("[T]he Supreme Court has consistently held that the definitions [under the Securities Act and the Exchange Act] are virtually identical and the coverage of the two Acts may be considered the same."). BNYMAS's argument, that since "guarantees" are not literally mentioned in the Exchange Act's definition of a "security," SFC, the guarantor, cannot be considered an "issuer," is sophistical, not persuasive.

BNYMAS argues also that Section 3.5 of the Guidelines, referring to both issuers and guarantors, suggests that one should not be a subset of the other, and that the Guidelines, when they mention "issuers," should not be interpreted to include "guarantors." Section 3.5 provides, "[i]nvestments . . . are not permitted in any security issued or guaranteed by ABN or Mellon, its Parent or its affiliates." Def. Ex. 12 at 1046. If securities that were "guaranteed" by an entity were necessarily "issued" by that entity, BNYMAS claims, then the word "guaranteed" is superfluous in Section 3.5, and courts should not interpret contracts to render terms

12

unnecessary. See, e.g., Markovitz v. Venture Info Capital, Inc., 129 F.Supp.2d 627, 654 (S.D.N.Y. 2001).

      Again, BNYMAS's reading is tortured. BNYMAS's argument is correct only if the parties intended that all "guarantors" were "issuers," without exception. But as noted earlier, under the Securities Act, a guarantor is only considered an issuer if the guarantees are incorporated into the security issued. There can be issuers who are not guarantors, and there can be guarantors who are not issuers. Thus, reading the word "issuer" to include certain guarantors does not render any portion of Section 3.5 superfluous.

      BNYMAS comments that Bloomberg LP, a commonly used reference, listed SFI, not SFC, as the "issuer" of the Notes, and argues that this distinction reflects trade custom. However, more important than Bloomberg's technical listing is how SFC itself understood the transaction. As evidenced by the Sigma companies' private placement memorandum, SFC, by disclosing that it was seeking an exemption from the Securities Act's rules for the Guarantees it issued, considered itself an "issuer" requiring such an exemption. See 15 U.S.C. §77d(a)(2); Pl. Ex. 20 at i; see also Def. Ex. A to Nov. 28, 2011 Declaration in Opposition to Motion for Partial Summary Judgment (Expert Report of Myron S. Glucksman) at ¶ 22 (acknowledging that SFC's guarantees were subject to the Securities Act).

      Finally, BNYMAS urges me to apply the doctrine of contra proferentum, or interpreting a contract against the drafter of the Guidelines, Banco de Colombia. This doctrine, however, is applied only as a "last resort." Albany Savings Bank, FSB v. Halpin, 117 F.3d 669, 674 (2d Cir. 1997). Further, the rule is generally not relevant where both parties' are sophisticated, as is the case here. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 n.2 (2d Cir. 1983).

In short, while the Agreement itself does not define the term "issuer," it was written with state and federal statutes in mind, and those statutes define guarantors as issuers, at least in cases like this one where the guarantees are incorporated into the underlying notes. I therefore find that the Agreement, examined in light of "the customs, practices, usages and terminology as generally understood" in the securities business, unambiguously includes SFC in its definition of "issuer," and I therefore find that, as a matter of law, SFC was an "issuer" under the parties' contract. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 396-97 (2d Cir. 2009).

### 2. "Located in"

Section 3.7 of the Agreement forbids investments in issuers "located in" the Cayman Islands. SFC, the guarantor and "issuer," was chartered as a limited liability company under the laws of the Cayman Islands, gained advantage of that status to enjoy favorable tax treatment under Cayman Islands law, and listed its registered office as located in the Cayman Islands, on South Church Street in George Town. Similarly, Standard & Poor's identified SFC as a "Cayman Islands Limited Liability Company." Def. Ex. 10 at 2.

BNYMAS argues, however, that SFC was "located" elsewhere, in London where its investment manager, Gordian Knot, worked. BNYMAS argues that hardly any of SFC's assets were located in the Cayman Islands—one percent at most. BNYMAS notes that Banco de Colombia's cash was not routed through the Cayman Islands; instead, the money was paid to SFI's Paying Agent in New York and then sent to London. SFC's bankruptcy proceedings took place in the United Kingdom. Def. Ex. 1 (Glucksman Dec.) at ¶ 47-49, 53, 56. Thomas Ford, the former head of BNYMAS's securities lending program, stated in a deposition that "We never would have gone to Grand Cayman to visit with Sigma, you would have gone to London." Pl. Ex. 18 at 127:6-10.

14

Under federal law, a corporate entity is located both where it is incorporated and where it has its principal place of business.[5] 28 U.S.C. § 1332(c); 28 U.S.C. § 1391. While the federal diversity statute is not directly applicable here, it reveals the typical definition of a corporation's location. BNYMAS cannot argue against the location where SFC chose to be chartered, and under whose laws SFC chose to be protected and identified. The rule for which BNYMAS argues would defeat the reasonable expectations of the parties. See Bank of New York v. Amoco Oil Co., 35 F.3d 643, 662 (2d Cir. 1994).

I hold that SFC, the guarantor and issuer, was "located" in the Cayman Islands, and that BNYMAS breached Section 3.7 of the parties' Agreement by investing Banco de Colombia's funds in Sigma's Structured Investment Vehicle.[6]

### 3. Ratification

BNYMAS argues that even if it did breach the Guidelines, its breach was ratified by Banco de Colombia.

Ratification is the knowing acceptance of the unauthorized acts of an agent, express or implied. See In re Vargas Realty Enterprises, Inc., 440 B.R. 224, 235 (S.D.N.Y. 2010). In order to prove an implied ratification, the party alleging ratification must show that the opposing party "with full knowledge of the material facts . . . has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a

---

[5] A limited liability company, like SFC, is located in every state where its members are citizens. See Handelsman v. Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 51 (2d Cir. 2000).

[6] BNYMAS argues that even if it breached Section 3.7, it cannot be held liable for such a breach because its actions were reasonable. BNYMAS bases its argument on the "Standard of Care" provision of the Agreement, which provides: "Agent [BNYMAS] shall use reasonable care in the performance of its duties hereunder consistent with that exercised by banks generally in the performance of duties arising from acting as agent for clients in securities lending transactions and shall be liable for any damages, costs or expenses arising out of its negligence, bad faith or willful misconduct." Def. Ex. 12 at 1031. However, where a party to a contract breaches the plain terms of a contract, such breach cannot be "reasonable."

15

ratification." Brown v. City of South Burlington, Vermont, 393 F.3d 337, 344 (2d Cir. 2004);

see also New York State Med. Transporters Ass'n v. Perales, 77 N.Y.2d 126, 131 (1990)

(finding that ratification requires that a party must have "intentionally condoned its agent's

practice"); Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank, 850 F.

Supp. 1199, 1213 (S.D.N.Y. 1994), aff'd, 57 F.3d 146 (2d Cir. 1995) ("Ratification . . . must be

intentional."). Ratification is an affirmative defense; a defendant asserting ratification has the

burden of proof on that issue. Banque Arabe, 850 F. Supp. at 1213; Rocky Point Properties, Inc.

v. Sear-Brown Group, Inc., 295 A.D. 2d 911, 913 (N.Y. App. Div. 2002).

BNYMAS alleges that Banco de Colombia ratified its alleged breach because it

knew both that a) it was invested in SFC and b) that SFC was located in the Cayman Islands. On

the first point, there is no doubt that Banco de Colombia officials were aware that their cash

collateral had been used to purchase securities from SFC and that their investment was not solely

tied to SFI. For example, on April 9, 2008, an officer of Banco de Colombia advised its risk

department that Moody's had downgraded SFC, and that a $20 million investment had been

made in notes "emitida por SIGMA FINANCE CORP" ("issued by Sigma Finance Corp"). Def.

Ex 19. Other emails from that time period show the concerns of Banco de Colombia with the

financial health of SFC.

Some employees of Banco de Colombia also knew that SFC was connected to an

offshore financial center. As far back as 2003, a Banco de Colombia employee keeping a list of

Guidelines violations wrote that Barclays had violated the Guidelines by investing in "SIGMA

FINANCE CORP." which was "located in [an] Offshore Financial Center." Pl. Ex. 12. On

August 1, 2007, an employee working in Banco de Colombia's risk department emailed another

employee about "Emisores [Issuers] Off-shore." Attached to that email was a list of 27 issuers,

16

and that list indicated that SFC, among other issuers, was located in an offshore financial center. Def. Ex. 16.

BNYMAS argues that these proofs raise a triable issue as to its defense of ratification. Under principles of agency law, the knowledge of employees typically is imputed to their supervisors. See Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784 (1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.").

I hold that Banco de Colombia did not ratify BNYMAS's breach of contract, and that there are no material facts in dispute. Three critical facts show this to be so. First, BNYMAS has not shown that the limited number of Banco de Colombia employees who had described SFC as an offshore company had any decision-making authority regarding the Notes, and therefore Banco de Colombia cannot be said to have "intentionally condoned its agent's practice." New York State Med. Transporters Ass'n, 77 N.Y.2d at 131. Second, Banco de Colombia required BNYMAS to certify compliance with Section 3.7 monthly, and BNYMAS did so throughout the time period at issue. Banco de Colombia had a right to rely on BNYMAS's certifications, and did not have a duty to examine where SFC was located. Under New York law, a promissor's warranties "relieve the promissee of any duty to ascertain the fact for himself." Metropolitan Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand).

Third, the Agreement of the parties provides specifically that ratification cannot be implied. Section 17(d) of the Agreement provides:

The failure of a party to this Agreement to insist upon strict adherence to any terms of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term

17

or any other term of this Agreement. All waivers in respect of a Default must be
in writing.

Def. Ex. 12 at 1032. There was no writing here in which Banco de Colombia agreed to the SFC

investment despite its location in the Cayman Islands. The clause therefore bars the ratification

defense.[7] See Town of Hempstead v. Incorporated Village of Freeport, 15 A.D.3d 567, 569-70

(N.Y. App. Div. 2005) (granting summary judgment in favor of plaintiff and denying

defendant's ratification defense where contract contained a no-waiver clause).

## B. Fraud and Negligent Misrepresentation Claims

Banco de Colombia argues that BNYMAS defrauded it and made a negligent

misrepresentation through its assurances about SFC.

Under New York law, a plaintiff can state a claim for fraud if: 1) the defendant

made a misrepresentation of fact; 2) that misrepresentation was material; 3) the defendant acted

with scienter—namely, that it knew the information it provided was false and made the

misrepresentation with the intent to induce reliance; 4) the plaintiff justifiably relied on the

misrepresentation; and 5) the plaintiff suffered damages. Eurycleia Partners, LP v. Seward &

Kissel, LLP, 12 N.Y.3d 553, 559 (2009); RBE Northern Funding, Inc. v. Stone Mountain

Holdings, LLC, 78 A.D.3d 807, 809 (N.Y. App. Div. 2010). The elements of a claim of

negligent misrepresentation are the same, except that instead of having to prove scienter, a

plaintiff must prove that there was a "special relationship" between the parties which imposed

---

[7] BNYMAS argues that waiver and ratification are different propositions. That is not so in this case. "Ratification is
'in essence, a waiver of existing rights.'" In re Levy, , 69 A.D.3d 630, 632 (N.Y. App. Div. 2010) (citation omitted).
The standard for finding a waiver of a right to collect damages for a breach of contract is the same as the standard
for finding a principal ratified the unauthorized acts of its agent: in both cases, a party must have "knowingly,
voluntarily, and intentionally abandoned" its contractual right. See Fundamental Portfolio Advisors v. Tocqueville
Asset Mgmt, L.P., 7 N.Y.3d 96, 104 (2006).

18

upon the defendant a duty to "speak with care." Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 451 (S.D.N.Y. 2006).

        Banco de Colombia asserts two bases for its fraud and negligent misrepresentation claims. First, Banco de Colombia claims that BNYMAS committed fraud in its certifications that it had not invested any of the bank's money in offshore entities. Second, Banco de Colombia claims that BNYMAS committed fraud in failing to disclose its negative assessment of SFC in the months prior to SFC's collapse, in violation of its fiduciary duties.

### 1. Misrepresentation through Certifications

        As part of its monthly certifications, BNYMAS certified to Banco de Colombia that "Eligible issuers, borrowers and repurchase agreement counterparties are not located in any of the financial offshore centers cited in the investment guidelines." Pl. Ex. 14. Banco de Colombia contends that BNYMAS knew this was not true, for it knew that it had invested the bank's money in SFI on the strength of guarantees by SFC, making SFC an issuer, and that SFC was located in the Cayman Islands.

        Banco de Colombia's fraudulent misrepresentation claim mirrors its breach of contract claim. Under New York law, a cause of action for fraud that is duplicative of a breach of contract claim should be dismissed. See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996) ("[I]ntentionally-false statements . . . indicating [an] intent to perform under the contract [are] not sufficient to support a claim of fraud under New York law."); Bullmore v. Banc of America Securities LLC, 485 F. Supp. 2d 464, 469 (S.D.N.Y. 2007); Perl v. Smith Barney, 230 A.D.2d 664, 680 (N.Y. App. Div. 1996); see also Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 606-07 (S.D.N.Y. 2004); Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 425-32 (S.D.N.Y. 2004). The

fraud claim based on the certifications necessarily requires the same proof as the breach of contract claim. Because the certification-based fraud claim duplicates Banco de Colombia's breach of contract claim, I grant Defendants' motion for summary judgment to dismiss this fraud claim.

I also dismiss the negligent misrepresentation claim. One of the basic elements of a negligent misrepresentation claim is that "defendant made a false representation that he or she should have known was incorrect." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000). The only misrepresentations that Banco de Colombia identifies are those relating to the monthly certifications, which, as previously discussed, are not actionable as a separate claim for relief.

## 2. Breach of Fiduciary Duty

Banco de Colombia alleges that in the spring of 2008, BNYMAS knew that SFC was unable to access funding to repay its borrowings and was in bad financial health, yet it purposefully withheld this information from Banco de Colombia, its client. Banco de Colombia's claim is often referred to as a "fraudulent concealment" claim by New York courts, although it is better characterized as a claim that BNYMAS breached its fiduciary duty to Banco de Colombia. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Red Apple Grp., Inc., 273 A.D.2d 140, 141 (N.Y. App. Div. 2000); Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc., 117 A.D.2d 284, 293 (N.Y. App. Div. 1986) ("[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.") (quoting Restatement of Agency 2d § 381).

20

A cause of action for a breach of fiduciary duty based on a failure to disclose requires the same elements as a cause of action for misrepresentation, namely, that the withheld information was material, that the defendant intentionally withheld the information from the plaintiff, that plaintiff justifiably relied on the defendant, and that plaintiff suffered damages. P.T. Bank Central Asia v. ABN Amro Bank N.V., 301 A.D.2d 373, 376 (N.Y. App. Div. 2003). Since this claim is grounded on an agent's fiduciary duties to its principal, a plaintiff also must prove that the defendant had a duty to disclose the information. Id.; Callahan v. Callahan, 127 A.D. 2d 298, 300 (N.Y. App. Div. 1987).

New York courts consistently hold that investment advisors who have substantial discretion over the investment of their clients' funds owe their clients a fiduciary duty. See, e.g., EBCI, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11 (2005) (holding that underwriters can be fiduciaries whey they act "as expert advisors to their clients on market conditions"); Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 411 (S.D.N.Y. 2005) (concluding that hedge fund managers owed a fiduciary duty to their investors). In contrast, in cases where investment banks engage in a more limited role for their clients and do not control their clients' investments, banks typically do not have a fiduciary duty. See Deutsche Bank Secs. Inc. v. Rhodes, 578 F. Supp.2d 652, 671 (S.D.N.Y. 2008) (finding that an investment bank hired to issue securities on behalf of a client had no duty to that client); THC Holdings Corp. v. Tishman, 93 Civ. 5393, 1998 WL 305639, at *4 (S.D.N.Y. June 9, 1998) (holding that a bank that was hired to find entities interested in investing in its client did not owe that client a fiduciary duty).

Here, the parties' Agreement provided that BNYMAS was to act as Banco de Colombia's agent for investments. Def. Ex. 12 at 1020. BNYMAS had broad discretion as to

21

where to invest Banco de Colombia's funds, including the cash collateral deposited with BNYMAS by borrowers of the securities that the bank held. That discretion was limited only by BNYMAS's duty to follow the Guidelines incorporated into the Agreement. BNYMAS made the decision to invest in the Sigma companies, and did so without consulting Banco de Colombia. Pursuant to the parties' Agreement, BNYMAS owed fiduciary duties to Banco de Colombia with respect to the investments made by BNYMAS for Banco de Colombia.

This fiduciary relationship did not end when Banco de Colombia advised BNYMAS that, as of March 19, 2008, the securities lending program was suspended and "new loans are to be ceased." Def. Ex. 12 at 1063. Banco de Colombia instructed BNYMAS to continue to provide indicative market prices on a weekly basis for securities that were not being sold so that Banco de Colombia could "determine the best course of action." Id. The letter stated that the parties' Agreement "remain[ed] in full force and effect" except where otherwise amended. Id. at 1064. Pursuant to the Agreement, Banco de Colombia continued to rely on BNYMAS for financial advice about the Notes, and BNYMAS continued to provide such advice. On April 5, 2008, Banco de Colombia asked BNYMAS for "a full report from you regarding this issuer [SFC and SFI], as well as the expectations going forward," Pl. Ex. 51, and repeated that request, asking for updates on June 20, July 28, and August 26, 2008. Pl. Ex. 63, 65. BNYMAS responded, assuring Banco de Colombia on May 16, 2008 that, "[s]hould there be further downgrade or issues with Sigma (or any other issue) we will be sure to keep you informed." Pl. Ex. 63.

BNYMAS argues that even if it did owe a duty to Banco de Colombia, it had no responsibility to disclose its opinions to its client. While BNYMAS had concluded in the spring

22

of 2008 that SFC was likely to default, that conclusion was only a belief about what might happen, BNYMAS contends, and there can be no liability for concealing a belief.

However, Banco de Colombia complains, not just that BNYMAS failed to convey opinions, but that it failed to convey facts that it knew about SFC's deteriorating financial condition after its customer specifically asked it to do so. A failure to disclose such information can be actionable. See Iowa Public Emps.' Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 144 (2d Cir. 2010) ("[A] statement specifying the risk of default is distinct from a statement of present or historical financial instability, even though they both bear upon the same risk."). For example, on January 31, 2008, a BNYMAS employee emailed a colleague and referenced "the difficulty [SFC] is currently experiencing in funding itself." Pl. Ex. 37. Two months later, SFC told BNYMAS directly that "things are getting worse for them" and that "[t]hey can not access funding, and maturities continue to drain liquidity." Pl. Ex. 48. This was information about SFC at that moment in time, not a prediction of future financial pains. BNYMAS had a duty to pass on this information to Banco de Colombia.

The fact that SFC could not obtain funding was material to its ability to repay the funds it borrowed, and to the decision that Banco de Colombia wished to make, whether to hold the Notes to maturity, or to sell them at market and recognize a substantial loss. BNYMAS knew that, for it feared to convey the information it had to Banco de Colombia and other customers, lest they begin to sell notes and bring down the market for such notes. See Pl. Ex 37 (explaining to BNYMAS colleagues that BNYMAS should "restrain our traditional response to heroically support our clients, until we better understand the implications of that support"); Pl. Ex. 59 (telling BNYMAS personnel not to call clients about the problems with SFC because "[i]f

23

we call them, we are more likely to create the problem we are trying to avoid (i.e. it becomes a self-fulfilling prophesy).").

   These statements also show that BNYMAS acted intentionally. BNYMAS purposefully withheld material information about SFC from Banco de Colombia in order to prevent a collapse of the market for SFC securities. See Pl. Ex. 37, 59. The record shows also that BNYMAS favored other clients over Banco de Colombia, providing more complete information to two British clients and offering asset swaps to the Saudi Arabian central bank and Iowa's pension fund more than two months before they made a similar offer to Banco de Colombia. See Pl. Ex. 52, 55, 59. When BNYMAS finally did propose an asset swap to Banco de Colombia, it told its customer that "Sigma's pricing has strengthened over the last two months" and that SFC was continuing to make interest payments on time. Pl. Ex. 63. In contrast, four weeks earlier, in the context of a swap offer to Wisconsin's Investment Board, BNYMAS advised that SFC was experiencing "liquidity challenges and related financial difficulties" and that "there is a significant likelihood that Sigma will not be able to continue to meet its commitments in respect of the Sigma Notes in the medium term." Pl. Ex. 61. BNYMAS breached its fiduciary duty to Banco de Colombia by painting a relatively rosy picture to it, while the true facts, its own beliefs, and the advice to more favored customers, painted a dire picture.[8]

   In addition, Banco de Colombia acted reasonably in relying on BNYMAS. Banco de Colombia had contracted with BNYMAS for the very purpose that BNYMAS would make

---

[8] The issue of intent is typically a question of fact for the jury. See Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."); Rudolph v. Turecek, 240 A.D.2d 935, 938 (N.Y. App. Div. 1997). However, in light of the BNYMAS emails that show that BNYMAS knowingly withheld details on SFC from Banco de Colombia, no reasonable jury could find that BNYMAS's failure to disclose was unintentional. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252-56 (1986).

24

investments on Banco de Colombia's behalf and to provide it with financial advice, so Banco de Colombia was justified in relying on BNYMAS to provide it with an accurate assessment of SFC.

I therefore hold that BNYMAS breached its fiduciary duty to Banco de Colombia in failing to provide its client with the detailed financial information about SFC that Banco de Colombia had requested.

## C. Damages

Banco de Colombia claims that the breach of contract by BNYMAS, and BNYMAS' failure to disclose SFC's true financial condition, entitles it to a $20 million recovery, the full extent of its loss. BNYMAS contends that Banco de Colombia's loss was due to market conditions, and that it is not liable in damages for that loss. I hold that there are triable issues of fact as to the issues of damages, at least without better briefing on the issue.

### 1. Damages for Breach of Contract

Banco de Colombia argues that the breach of Section 3.7 of the Agreement was a material covenant, the breach of which entitles it to the replacement of its investment, to put it in "the same position as it was in prior to the wrongdoing." Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., 935 N.Y.S.2d 858, 869 (N.Y. Sup. Ct. 2012) (citing Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 489 (2007)).

BNYMAS argues that its liability is limited to damages that were a reasonably foreseeable consequence of the breach, and loss of the Sigma investment was not such a consequence. See, e.g., Goodstein Corp. v. City of New York, 80 N.Y.2d 366 (1992) ("[I]t must be shown that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.") (citation omitted); Kenford Co. v. County of Erie, 73 N.Y. 2d

25

312 (1989) (holding that the party breaching a contract to build a football stadium was not liable for the lost appreciation of neighboring properties; such damages were not the reasonably foreseeable consequence of a breach).

Those who negotiated Section 3.7 of the contract did not communicate to each other their purpose in including such a provision. Banco de Colombia maintains that the clause, forbidding investments of cash resources in Cayman Islands issuers, was made part of the contract in order to eliminate an important financial risk associated with the absence of strong regulation of issuers and securities in jurisdictions like the Cayman Islands. BNYMAS contends that Section 3.7 had nothing to do with reducing risk, but instead was inserted to ensure that the Colombian government did not invest its reserves in countries that assisted corporations in tax avoidance.

The Sigma investment was split between SFI, a special purpose entity that was the nominal issuer of the Notes, and SFC, the guarantor and real obligor of the Notes. Since SFI was a Delaware company, the Securities Act of 1933 and federal regulations governed the issue of disclosure, regardless of SFC's domicile. But what, if any, differences, apart from disclosures, arose from the fact that SFC was a Cayman Islands company, and what were the financial and regulatory consequences of any such differences? The record is largely silent.

The evidence is also lacking on any intervening causes of harm. The Sigma companies, like other SIVs, borrowed at short-term rates to fund purchases of long-term mortgage bonds and other asset-back securities, and depended on relatively frequent borrowings to pay off short-term obligations. Banco de Colombia lost its Sigma investment, BNYMAS contends, because of the global financial crisis following the collapse of Lehman Brothers and other financial institutions. SFC became unable to pay its obligations, and had to seek protection

26

of a liquidation, not because it was incorporated in the Cayman Islands, but because its sources of funding collapsed.

These complex issues were not adequately covered in the parties' submissions. Should the motions for summary judgment be renewed, the parties will have to develop the law of damages in greater detail, to describe in what instances restoration damages, the price of restoring a party to the conditions required by their contract, should measure a damage recovery, and in what instances a damage recovery should be limited to the consequences that are reasonably foreseeable at the time the contract was made.

Quite possibly, however, the record may not be adequate to support a summary judgment. If, as it appears, the causal effects of BNYMAS' breach present issues of fact such as those described above, and if the testimony of experts may be required to help a court or jury understand these issues, a renewed motion for summary judgment would be inappropriate.

### 2. Damages Caused by Breach of Fiduciary Duty

If BNYMAS had conveyed a completely accurate picture of SFC to Banco de Colombia in the spring of 2008, Banco de Colombia could have instructed BNYMAS to sell the Notes on the market, and perhaps mitigate the loss of its investment.

On the state of facts known to Banco de Colombia in the spring of 2008, however, it is not clear if the market could have sustained a sale of the Notes prior to maturity. The record does not show what kind of market there was for investments of the type involved in this case or if, indeed, there was any market. It is also not clear if Banco de Colombia would have been willing to incur a loss by such a sale. Marco Antonio Ruiz Gil, the head of Banco de Colombia's international reserves department, testified at his deposition that Banco de Colombia "might have sold" the Notes if BNYMAS had provided a more accurate assessment of SFC to Banco de

Colombia, but he could not say for certain that Banco de Colombia would have done so. <u>See</u>
Def. Ex. 6 (September 13, 2012 Deposition of Marco Antonio Ruiz Gil) at 155:7-157:2.
Certainly, Banco de Colombia's decision not to participate in the asset swap of the Notes in June
2008 suggests Banco de Colombia had been willing to take a risk in the hope that SFC would
pay rather than default.

How a true and full set of facts would have affected the decision of a reasonable
and reliant holder of the Notes is an issue that cannot be determined on summary judgment and
must be reserved for a factfinder. On this issue, also, the testimony of experts would be useful at
trial.

## IV.   CONCLUSION

For the foregoing reasons, I grant Banco de Colombia's motion for summary
judgment on the issue of BNYMAS's liability with respect to the breach of contract and
fiduciary duty/failure-to-disclose claims. I grant Defendants' motion for summary judgment
dismissing the fraudulent misrepresentation and negligent misrepresentation claims. The parties
shall appear for a status conference on August 30, 2013, at 10 a.m., for a discussion of the next
steps in the case.

The clerk shall mark the motions (Doc. Nos. 57, 62, 98 and 100) terminated.

SO ORDERED.

Dated:      July 2, 2013
            New York, New York                ALVIN K. HELLERSTEIN
                                              United States District Judge